IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Crim. No. CCB-95-364 |
| | * | |
| DAVID FURTADO GRAY | * | |

\*\*\*\*\*\*\*

## MEMORANDUM

David Gray moves for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (the "compassionate release" statute), based on underlying health conditions that make him particularly susceptible to serious illness related to COVID-19. (ECFs 159, 168, 180). Gray is serving a life sentence for the 1993 murder of Jessie Lee Waller. Gray is now fifty-one years old and has been incarcerated for twenty-seven years, over half his life. The government opposes Gray's motion, (ECF 187), and Gray has replied (ECF 189).[1] For the reasons explained below, the motion will be granted and Gray's sentence will be reduced to time served, followed by a five-year term of supervised release.[2]

## BACKGROUND

In April 1996, a jury found Gray guilty of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), and possession of a firearm in connection with a crime of violence, in violation

---

[1] Gray has additionally submitted, through counsel, a notice of supplemental authority, (ECF 191), and, on his own behalf, an additional supplement documenting the BOP's response to COVID-19 at his institution, USP Pollock, (ECF 195). The court has also received two letters from friends of Gray in support of his release in addition to those letters of support included with Gray's motion. (ECFs 190, 194). The court considers these submissions.

[2] Gray additionally filed a pro se motion to reduce his sentence pursuant to Section 404 of the First Step Act of 2018, (ECF 146), which the government opposes, (ECF 187). Through counsel, Gray has since clarified that he is not requesting relief under Section 404. (ECF 189 at 19). Accordingly, the court will deny that motion as moot.

1

of 18 U.S.C. § 924(c). *United States v. Gray*, 137 F.3d 765, 767 (4th Cir. 1998). The government's evidence at trial showed that Gray was offered a contract of $5,000 from the leader of a heroin distribution ring to kill Jessie Lee Waller and that he recruited two associates to assist in the murder. *Id.* at 767–68. Gray was told where to find Waller and was the only one of the co-conspirators who could identify him. On October 19, 1993, Gray and two others ambushed Waller and two other men. At least twenty-nine shots were fired at the three victims, and the government submitted that fourteen of those shots came from a weapon seized from Gray during a later, unrelated, arrest. *Id.* Waller was killed in the gunfire, and the two men with him were seriously injured. *Id.* Gray contended at trial that eyewitnesses reported seeing a different man, not Gray, shoot Waller. (ECF 187-3, Presentence Report ¶ 7). Gray's sentencing was held on June 21, 1996, before the Hon. Andre Davis. (*Id.* at 1). Gray's guideline sentence was life imprisonment without parole for the 18 U.S.C. § 1959(a)(1) conviction, followed by a five-year consecutive sentence for his conviction under 18 U.S.C. § 924(c). (*Id.* ¶ 37). At that time, federal district court judges were constrained to sentence those convicted in their courts according to the federal sentencing guidelines. *See* 18 U.S.C. § 3553(b) (1996); *United States v. Booker*, 543 U.S. 220 (2005). Because of the mandatory nature of the guidelines, Judge Davis sentenced Gray to life in prison without parole followed by a consecutive five-year sentence. (ECF 182-10, Davis, J., Ltr. of Support; ECF 187-3, Presentence Report at 2).

In December 2018, Congress enacted the First Step Act. *See* Pub. L. No. 115-391, 132 Stat. 5194. As part of the Act, Congress amended 18 U.S.C. § 3582(c), which empowers courts to reduce a term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." *See* 18 U.S.C. § 3582(c)(1)(A)(i); Pub. L. 115-391, Title VI, § 603(b), Dec. 21, 2018, 132 Stat. 5239. Before the First Step Act was enacted, a court could review a prisoner's sentence pursuant to § 3582(c)(1)(A) only "upon motion of the Director of the Bureau of Prisons" ("BOP"). *Id.* But under the amended statute, a court may conduct such a review also "upon motion of the defendant," if the defendant has

exhausted all administrative remedies to appeal the BOP's failure to bring a motion, or if thirty days have lapsed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" *Id.* The court may authorize compassionate release if, after considering the factors set forth in 18 U.S.C. § 3553(a), the court finds that "extraordinary and compelling reasons" warrant it. *See* 18 U.S.C. § 3582(c)(1)(A)(i).

On December 18, 2019, Gray filed an administrative request for compassionate release with the warden of USP Pollock, where he is currently incarcerated. (*See* ECF 182-2). After receiving no response to this request, Gray filed an administrative appeal, and the warden denied the request on June 19, 2020. (ECFs 182-4, 182-3). The government does not contest that Gray's motion is properly before the court. Thus, the only issues are whether there are "extraordinary and compelling reasons" to reduce Gray's sentence and whether the § 3553(a) factors weigh in favor of a sentence reduction.

## DISCUSSION

Under 28 U.S.C. § 994(t), the United States Sentencing Commission has the responsibility to define "what should be considered extraordinary and compelling reasons for sentence reduction" under § 3582(c)(1)(A). The most recent Sentencing Commission policy statement defining "extraordinary and compelling reasons" for sentence reduction, Guideline § 1B1.13, predates the First Step Act and, as the Fourth Circuit recently held, is not a policy statement that applies to motions for compassionate release brought by defendants, because its plain text "constrains the entire policy statement to motions filed solely by the BOP, . . . and not by defendants themselves." *United States v. McCoy*, 981 F.3d 271, 281–82 (4th Cir. 2020) (internal quotation marks and citation omitted). In the absence of an "applicable policy statement[] issued by the Sentencing Commission" concerning what may be an "extraordinary and compelling reason" for compassionate release when a defendant brings a motion under § 3582(c)(1)(A), "district courts are 'empowered . . . to consider *any*

3

extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (quoting *United States v. Zullo*, 976 F.3d 228, 230 (2d Cir. 2020)).

Gray contends with a number of health conditions that, according to the CDC, increase his risk of severe illness (meaning the risk of hospitalization, intensive care, a ventilator, or death) if he were to contract COVID-19, including obesity, type II diabetes, and hypertension. (ECF 182-5, Medical Records, at 4, 6). *See COVID-19: People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Apr. 29, 2021). Within the last year, Gray has complained of intermittent chest pain. BOP medical staff have noted that Gray has edema and is at risk of heart failure, and, after observing decreased breathing sounds in his right lung base, requested a pulmonology appointment for him. (ECF 182-5, Medical Records, at 2, 5, 15, 16). Those symptoms may indicate serious heart and lung conditions which are also highly correlated with a risk of severe illness from COVID-19. *See COVID-19: People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Apr. 29, 2021). (*See also* ECF 182-6, Physician Expert Ltr.). The CDC has warned that "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in an individual," *COVID-19: Underlying Medical Conditions Associated with High Risk for Severe COVID-19: Information for Healthcare Providers*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html (updated Apr. 30, 2021), and at fifty-one, Gray is also at an increased risk by virtue of his age, *COVID-19: People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Apr. 29, 2021) ("[M]ore than 95 [percent] of COVID-19 deaths occur in people older than 45."). Further compounding the risk to Gray

is the mere fact of his incarceration, *see, e.g.*, *Coreas v. Bounds*, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19.").

The government argues that despite the risks the above conditions pose to Gray's life should he contract COVID-19, they do not rise to the level of an "extraordinary and compelling" reason for a sentence reduction because they are "minor, common," and can be controlled with medication or by Gray's own lifestyle choices. (ECF 187 at 8, 12–15). The government also contends that at the time of briefing, USP Pollock had experienced relatively few cases of COVID-19. (*Id.* at 10). These arguments do not persuade the court to reconsider its well-established view, consistent with other district courts, that "in the grip of a public health crisis more severe than any seen for a hundred years," *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 223 (D. Md. 2020), serious chronic medical conditions that put incarcerated people such as Gray at increased risk of severe illness from COVID-19 are extraordinary and compelling reasons for compassionate release, *see, e.g.*, *United States v. Boyce*, No. CR CCB-07-383, 2021 WL 488526, at *2 (D. Md. Feb. 10, 2021) (court agreed with the government and the defendant that obesity and hypertension present an extraordinary and compelling reason to consider compassionate release); *United States v. Fields*, No. CR CCB-08-241, 2020 WL 7263528, at *2 (D. Md. Dec. 10, 2020) (defendant's chronic kidney disease and high blood pressure were an extraordinary and compelling reason to consider compassionate release); *United States v. Harmon*, No. CR ELH-13-0296, 2021 WL 351173, at *8–9 (D. Md. Feb. 2, 2021) (defendant's obesity and hypertension, were an extraordinary and compelling reason to consider compassionate release); *United States v. Crenshaw*, Crim. No. RDB-11-0456, 2020 WL 4436367, at *2 (D. Md. Aug. 3, 2020) (defendant's type II diabetes and hypertension were an extraordinary and compelling reason to consider compassionate release); *United States v. Wright*, No. CR TDC-17-0388, 2020 WL 2571198, at *3 (D. Md. May 21, 2020) (defendant's obesity, diabetes, hypertension, chronic kidney disease, and asthma were an extraordinary and compelling reason to consider

compassionate release); *United States v. Zukerman*, 451 F. Supp. 3d 329, 335–36 (S.D.N.Y. 2020) (defendant's obesity, diabetes, and hypertension were an extraordinary and compelling reason to consider compassionate release); *United States v. Lacy*, no. 15-cr-30038, 2020 WL 2093363, at *6 (C.D. Ill. May 1, 2020) (defendant's obesity, together with diabetes and hypertension treated by medication, presented an extraordinary and compelling reason to consider compassionate release).

While the BOP's efforts at containing the spread of COVID-19 are commendable, they by no means eliminate the risks to prisoners like Gray. It is not safe to assume that USP Pollock, which currently has no active infections of COVID-19 among its population or staff, will continue to avoid further infections for the remainder of this crisis. *Wise v. United States*, Criminal No. ELH-18-72, 2020 WL 2614816, at *7 (D. Md. May 22, 2020). More than forty percent of people incarcerated at USP Pollock have contracted COVID-19 over the last sixteen months. *See COVID-19 – Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last accessed May 4, 2021) (documenting 518 recovered prisoner cases of COVID-19); *USP Pollock*, BOP, https://www.bop.gov/locations/institutions/pol/ (noting population of 1,248 at institution).

Gray's eligibility for compassionate release does not guarantee relief, however. The court also must consider the factors set forth in 18 U.S.C. § 3553(a) "to the extent that they are applicable[.]" *See* 18 U.S.C. § 3582(c)(1)(A).

The court first considers the "nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), including Gray's post-sentencing conduct, which "provides the most up-to-date-picture of [his] 'history and characteristics.'" *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). Gray's offense was, in a word, chilling. The evidence at trial showed that Gray, at the behest of a drug dealer and with the prospect of some significant financial gain, planned and committed what amounted to the execution of Jamie Lee Waller. Gray was twenty-three years old when he killed Waller, and before that he

6

acknowledges that he was "deeply involved" in the drug trade in Baltimore, (ECF 182-8, Dr. Montanerelli Ltr.; ECF 182-12, D. Gray Ltr.), a fact which is reflected in Gray's 1989 convictions for distribution of cocaine and possession of heroin, and his 1991 conviction for felony theft and malicious destruction of property (ECF 187-3, Presentence Report ¶¶ 28–30).

Judge Davis observed at Gray's sentencing, however, that his prior record, though serious, was not violent. (ECF 182-10, Davis, J. Ltr.). Without minimizing the harm Gray inflicted on Waller, the other two victims, their families, and the larger community, the court also must acknowledge that Gray's life up to the point of his incarceration was marked by near-continuous instability and trauma. Gray was raised in a large foster family, and though his foster parents treated him well, Gray, a foster brother, and a foster sister experienced [REDACTED] (ECF 182-8, Dr. Montanerelli Ltr.; ECF 182-11, D. Gray Ltr.). Both of Gray's foster parents died by the time Gray was 15, and his next caretaker, another foster brother, died [REDACTED] within another year. (ECF 182-8, Dr. Montanerelli Ltr.; ECF 187-3, Presentence Report ¶ 43). Soon living with yet another foster sibling, and with little financial means, Gray dropped out of high school in order to work. He spent time with other teenagers who sold drugs and eventually joined them in order to support himself and his household. (ECF 182-8, Dr. Montanerelli Ltr.). By the time Gray was convicted of the murder of Waller, Gray himself had been shot several times and had lost a serious girlfriend to gun violence. (*Id.*).

Reflecting on this history after over 26 years in prison, Gray accepts responsibility for Waller's death, and states that he understands the harm he caused and that he has used his time in the BOP to better himself and his community. (ECF 182-12, D. Gray Ltr.). Indeed, the record demonstrates that Gray's post-sentencing conduct has been remarkable. Within his first year in the BOP, Gray earned his GED, and since then he has taken 132 courses. He completed over 100 of these courses within the last ten years. (ECF 182-14, BOP Progress Report). Gray's disciplinary history reflects he had some initial difficulty conforming his behavior to institutional rules. Between 2000

7

and 2013 he incurred eleven disciplinary infractions, which BOP staff at his current placement, USP Pollock, have described as "minor." (ECF 182-14, BOP Progress Report at 5; ECF 182-15, Ltrs. of Support at 32). Since 2013, Gray has not been sanctioned for any disciplinary infractions. Gray's greatly improved conduct is reflected in his selection, while at USP Atwater, to live in a specialized Reentry Program Unit available only to individuals who are discipline free, active in programming, and who maintain the "highest standards." (ECF 182-15, Letters of Support at 37). Gray was not only selected into this program, but he also was chosen by staff as an instructor and mentor to other programs offered at USP Atwater, including the prison's Victim Awareness Program, a restorative-justice focused educational program "structured to hold offenders accountable for the harm they have caused and to help foster their empathy toward crime victims and survivors." (*Id.* at 31, 37).

Gray's exemplary conduct while incarcerated has garnered him a long list of supporters. The court has received and read twenty-six letters in support of Gray's release from his friends and family, BOP personnel, and community leaders. These letters compellingly document Gray's personal growth and his efforts to improve the lives of others. (*Id.*). A dozen men either formerly or currently incarcerated with Gray have described Gray's positive impact on their lives and on the prison community. They consistently write that Gray often steps in as a "voice of reason" to diffuse conflict between other prisoners, that he is quick to offer mentorship and educational or material assistance to others, and that he is humble, a good and empathetic listener, and a devoted Muslim. (*Id.* at 3–8, 10–12, 17, 23–25, 28–29, 33–36; ECF 190, J. Ramirez Ltr.). Some of these men disclosed that Gray's mentorship and friendship saw them through deeply personal struggles and mental health crises, giving them hope and a model for how to "live a life of substance" while serving lengthy, sometimes life-long sentences. (ECF 182-15, Ltrs. of Support at 3–4, 36; ECF 190, J. Ramirez Ltr.). BOP personnel also describe Gray as a genuinely changed person, a clear mentor to other prisoners, and someone on whom they can depend. (*Id.* at 2, 9, 13–15, 31–32, 37). Lieutenants at USP Atwater wrote

8

in 2016 that Gray's responsible nature and work ethic made him "highly sought out" when staff needed a critical task completed. (*Id.* at 2, 15).

Family, friends, religious leaders, and his sentencing judge, the retired Hon. Andre Davis, have also written that Gray has maintained ties with his family, has consistently shown remorse for his actions, and is a mentor to others. (ECF 182-15, Ltrs. of Support, at 13–14, 16–18, 26–27; ECF 194, Joneses Ltr.; ECF 182-10, Davis, J. Ltr.).

Gray's history has a familiar arc with a rare turnaround. Like many young Black men growing up in his community, Gray endured a child- and young-adulthood of significant trauma and appears to have had few resources to help him process or heal from it. Gray's decision to begin selling drugs to support himself was the first in a series of poor choices to engage in criminal activity that escalated into violence, eventually of the most serious and callous kind, his participation in the taking of a life. At age 23, faced with the reality of incarceration for the remainder of his life, Gray had further difficult choices to make about the kind of adult he would become and the life he would live in the BOP. In this environment, Gray has consistently improved his conduct and his character over time. He appears to the court to have become a reflective adult who holds himself responsible for his actions and demonstrates a clear commitment to his education, his well-being, and the well-being of those in his community.

With this history in mind, the court considers the need for the sentence imposed to afford adequate deterrence and to protect the public from further crimes by Gray. 18 U.S.C. § 3553(a)(2)(B)–(C). The government argues that the seriousness of Gray's offense and his criminal history show that Gray remains a great danger to the public, and that any reduction in sentence would not afford adequate deterrence to criminal conduct. This argument does not adequately address the above-discussed progress Gray has made during his incarceration, or the fact that, though he was certainly fully responsible for his actions, he was barely an adult when he committed these crimes. Gray's

participation in killing Waller represents a singular and extreme act of violence over the course of his fifty-one-year life. His time in the BOP has been free from violence and, in the last eight years, free from any infractions at all. Gray also has presented a sound release plan, which the government does not address. Gray plans to reside with [REDACTED] and who, [REDACTED] is willing to support Gray as he transitions into the community. (ECF 182-13, Release Plan). Gray is represented by the Clinical Law Program at the University of Maryland School of Law. The Clinical Law Program houses a Law & Social Work Services Program ("LSWSP"). Gray will have ongoing access to LSWSP's services, including supportive counseling, and linkage to job training, medical and mental health services, and assistance obtaining identification and applying for government benefits. (*Id.*). LSWSP has already assisted Gray in identifying and compiling for the court additional community members who are willing to provide Gray with reentry services, job training, and emotional and spiritual support. (*Id.*). On this record, and considering also the five-year period of supervised release that Gray would serve if released, the court cannot conclude that further incarceration is necessary to protect the public or to adequately deter Gray from further crimes.

As for the need to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment, *see* 18 U.S.C. § 3553(a)(1)(A), though a serious and lengthy prison sentence was absolutely warranted in this case, the court finds that a life sentence is greater than necessary for Gray. At the time of Gray's sentencing, a life sentence was mandatory. Today, though the sentencing guidelines would likely still advise that the court impose a life sentence, *see* U.S.S.G. §§ 2A1.1, 2E1.3; 18 U.S.C. § 3553(a)(4) (court to consider the applicable guideline sentence), the guidelines are advisory and not binding on the court. This is a significantly changed landscape, and it allows the court to take into account Gray's full history in determining the sentence that is sufficient to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). Notably, Gray's sentencing judge has written in support of Gray's release, stating emphatically: "If I

had had the discretion to sentence Mr. Gray to anything less than life without parole, I certainly would have," given Gray's youth, his nonviolent criminal record, and his childhood history of trauma. (ECF 182-10). In determining a sufficient sentence for Gray, the court weighs heavily Judge Davis's assessment that a life sentence was not warranted. Though Gray's crime was serious, the twenty-seven years he has served is a very long period of incarceration that represents a substantial punishment. Considering the credit toward his sentence for good behavior that Gray would have undoubtedly received had he been given a term-of-years sentence, the 324 months Gray has served is more appropriately viewed as the equivalent of 372 months, or thirty-one years. *See* 18 U.S.C. § 3624(b)(1). This sentence is consistent with the average sentence imposed over the past five years for first-degree murder. *See* United States Sentencing Commission, Interactive Data Analyzer, Average and Median Sentence Length, 2016–2020, Guideline § 2A1.1, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed May 4, 2021) (showing average sentence of 302 months.

Other judges in this district have similarly recognized the bluntness of mandatory life-sentences the district court was required to impose prior to *Booker*, and have reduced life sentences for defendants whose offenses included participation in drug-related killings or in drug conspiracies that involved murder reasonably foreseeable to them. *See, e.g.*, *United States v. Hill*, No. CR JKB-96-00399, 2020 WL 2089379, at *2 (D. Md. Apr. 30, 2020) (reducing sentence to 330 months); *Carter v. United States*, No. CR ELH-00-0100, 2020 WL 1914766, at *9 (D. Md. Apr. 17, 2020) (reducing sentence to 35 years); *United States v. Cheese*, No. CR ELH-98-259, 2020 WL 3618987, at *10 (D. Md. July 2, 2020) (reducing sentence to 28 years); *Brown v. United States*, No. CR ELH-00-0100, 2020 WL 1248950, at *10 (D. Md. Mar. 16, 2020) (reducing to 40 years sentence for defendant who led a violent drug trafficking organization and was found at sentencing to have committed a premeditated murder in furtherance of the drug conspiracy). And other federal district

courts have reduced once-mandatory life sentences of defendants who, like Gray, were convicted of murder under 18 U.S.C. 1959(a)(1) when they were very young and, with no possibility of release, afterwards committed their lives to their rehabilitation and to mentoring others. *See United States v. Cruz*, No. 3:94-CR-112 (JCH), 2021 WL 1326851, at *15 (D. Conn. Apr. 9, 2021) (reducing sentence to time-served at nearly 27 years); *United States v. Perez*, No. 3:02CR7 (JBA), 2021 WL 837425, at *6 (D. Conn. Mar. 4, 2021) (reducing sentence to time-served at twenty-three years). *Cf. United States v. Little*, No. 3:95-CR-105-MOC-1, 2021 WL 1394858, at *5 (W.D.N.C. Apr. 13, 2021) (denying motion for compassionate release to defendant serving life sentence for violation of 18 U.S.C. § 1959(a)(1) where defendant did not express remorse for his crimes, prior record included weapons and assault convictions, and disciplinary history in the BOP included violent infractions).

Based on the above considerations, and in light of the principle that a sentence should be "sufficient, but not greater than necessary," *see* 18 U.S.C. § 3553(a), the court finds that the § 3553(a) factors weigh in favor of reducing Gray's sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). This, combined with the "extraordinary and compelling" risk to Gray of severe illness from COVID-19 should he remain in prison, leads the court to conclude that Gray is entitled to compassionate release.

## CONCLUSION

For the foregoing reasons, Gray's motion for compassionate release (ECFs 159, 168, 180) will be granted and his sentence will be reduced to time served. Gray's motion for sentence reduction under Section 404 of the First Step Act of 2018 (ECF 146) will be denied as moot.

The court will impose on Gray a five-year period of supervised release for his conviction under 18 U.S.C. § 1959(a)(1) and a three-year period of supervised release for his conviction under 18 U.S.C. § 924(c), *see* 18 U.S.C. § 3583(b), to be served concurrently, with the mandatory and

standard conditions[3] and, to assist with his transition, the additional condition that Gray will spend the first six months of supervised release on home confinement, to be monitored by U.S. Probation, using location monitoring technology at the discretion of the Probation Officer. For the six-month home confinement period, Gray shall not leave the address approved by U.S. Probation except for activities approved in advance by U.S. Probation. In addition, he will be required to comply with all directives of federal, state, and local governments related to public health issues, including COVID-19.

      A separate Order follows, which will be stayed for up to fourteen days to make appropriate travel arrangements and to ensure Gray's safe release, including by placing Gray in quarantine for a period of fourteen days and to evaluate him for the purposes of receiving a medical clearance. If more than fourteen days are needed to make appropriate travel arrangements and ensure the defendant's safe release, the United States shall immediately notify the court and show cause why the stay should be extended.

| | |
|---|---|
| __5/10/2021__ | __/S/_____ |
| Date | Catherine C. Blake |
| | United States District Judge |

---

[3] *See* Standing Order 2020-13 (Jun. 10, 2020).